Receipt number AUSFCC-11331300

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC INTERNATIONAL CENTER FOR HIGH TECHNOLOGY RESEARCH,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. **26-924 C** |

# COMPLAINT

1. This case is a breach-of-contract action arising from a decision by the U.S. Environmental Protection Agency ("EPA") to unilaterally and unlawfully terminate a competitive grant awarded to Plaintiff Pacific International Center for High Technology Research under EPA's Environmental and Climate Justice Community Change Grants Program. Plaintiff's Grant Agreement with EPA gave rise to binding contractual obligations between the parties. By this action, Plaintiff seeks damages resulting from EPA's breach.

2. Enacted in 2022, the Inflation Reduction Act created the Environmental and Climate Justice Program ("ECJ Program" or "ECJP"), providing $2.8 billion for grants to help disadvantaged communities address a wide range of environmental and climate justice issues. In implementing the ECJP, EPA created four grant programs, including the Community Change Grants ("CCG") program.

3. The CCG program was aimed at empowering communities and their partners to design, develop, and implement multi-faceted community-driven projects addressing the needs of disadvantaged communities through a variety of strategies, including reducing and preventing

pollution, building resilience to climate change and mitigating climate risks, enhancing involvement in government processes related to environmental and climate justice, and expanding access to jobs and economic opportunity through workforce development.

4. Plaintiff applied for a competitive CCG grant in July 2024 and was subsequently awarded $13,939,738. In December 2024, EPA entered into a binding Grant Agreement with Plaintiff and obligated the grant award funds to Plaintiff.

5. Plaintiff subsequently received the full amount of its award and commenced performance under the Grant Agreement.

6. EPA subsequently terminated the entire statutorily mandated ECJ program and terminated all grants. The United States District Court for the District of South Carolina has already ruled that the agency policy guidance cancelling the ECJ program was contrary to law and arbitrary and capricious. *See Sustainability Inst. v. Trump*, No. 2:25-2152-RMG, 2026 WL 1694522, at *5 (D.S.C. June 11, 2026).

7. On May 1, 2025, EPA abruptly notified Plaintiff that it was unilaterally terminating the Grant Agreement "effective immediately." EPA also suspended Plaintiff's access to the account, cutting off any access to grant funds by Plaintiff. The sole reason for the termination given by EPA was that the grant award was "no longer consistent" with EPA funding priorities.

8. The general and programmatic terms and conditions applicable to the Grant Agreement specified that Plaintiff's award could be unilaterally terminated by EPA only in the event of Plaintiff's noncompliance with the Agreement or as a result of adequate evidence of fraud, waste and abuse by Plaintiff. EPA failed to comply with these terms and conditions in terminating the Grant Agreement.

9. By unilaterally terminating the Grant Agreement without any legally sound

justification and cutting off the grant funds awarded to Plaintiff, EPA breached the Agreement's express terms and violated the covenant of good faith and fair dealing implied in the Agreement.

10. Defendant's unlawful termination of Plaintiff's grant award prevented Plaintiff from proceeding with or completing the project work supported by the grant, resulting in extensive compensable harm to Plaintiff, as further described below.

11. Plaintiff files this suit to recover money damages for EPA's breach of the Grant Agreement.

## JURISDICTION AND VENUE

12. Jurisdiction over the claims advanced in this case is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491.

## PARTIES

13. Plaintiff Pacific International Center for High Technology Research ("PICHTR") is a Hawai'i-based nonprofit organization. PICHTR provides strategic expertise and support to community organizations, companies, and public entities striving to create a thriving, safe, and more sustainable planet. PICHTR is a regional leader in planning, development, evaluation and deployment of place-based sustainable practices, facilitating their adoption and implementation throughout Hawai'i and Asia Pacific. PICHTR's areas of focus include clean energy, technology, disaster preparedness, and resource conservation.

14. Defendant is the United States of America, acting through the Environmental Protection Agency.

## FACTUAL BACKGROUND

### I. EPA's Environmental and Climate Justice Program

15. On August 16, 2022, the Inflation Reduction Act ("IRA") was signed into law. Pub. L. 117-169, 136 Stat. 1818.

16. The IRA created the Environmental and Climate Justice Program ("ECJ Program" or "ECJP")—the largest investment in environmental and climate justice in U.S. history. The ECJP was codified in Section 138 of the Clean Air Act, 42 U.S.C. § 7438.

17. Under this program, EPA was provided with $2.8 billion to award grants to help disadvantaged communities address a wide range of environmental and climate justice issues, and $200 million for technical assistance related to these grants.

18. To ensure these grants benefited those most impacted by pollution and environmental harms, Congress instructed that the EPA Administrator "shall" use these funds to award grants to eligible entities to carry out a range of environmental and climate justice activities including investments in low and zero emission technologies, workforce development that helps reduce greenhouse gas emissions and other air pollutants, mitigation of climate and health risks from extreme heat and wildfire events, advancement of climate resiliency and adaptation, and facilitation of engagement with disadvantaged communities. *See* 42 U.S.C. § 7438(b)(2).

19. Following Congress's mandate, EPA created four grant programs, including the Community Change Grants ("CCG") program. The CCG program funds projects that enhance climate resiliency, mitigate climate and health risks, engage in community-led air and water pollution monitoring, and support workforce development for greenhouse gas reduction and pollution abatement in disadvantaged communities most burdened by environmental and health harms.

20. In its Notice of Funding Opportunity ("NOFO") soliciting grant applications, EPA underscored the "historic level of support" provided by the CCG program, which would enable communities to overcome longstanding environmental challenges and implement meaningful solutions to meet community needs "now and for generations to come."

21. Following Congress's direction, EPA established a competitive bidding process to receive and assess grant proposals for the CCG program. EPA selected 105 recipients from 2,700 applications and awarded a total of nearly $1.6 billion to those proposals the agency judged best able to carry out Congress's mandate. Plaintiff was among those grant recipients.

**II. Plaintiff's Uplifting Wai'anae Grant**

22. The historically disadvantaged community of Waiʻanae is located in the southwestern portion of the Island of O'ahu in Hawaiʻi. The community has been home to the largest percentage of unsheltered Native Hawaiians on Oʻahu. For decades, the people of Wai'anae have carried the burden of socio-economic pressures disproportionately.

23. Puʻuhonua O Waiʻanae ("POW") Farm Village is a community of approximately 200 people, two-thirds of whom are Native Hawaiian, who had previously been living unhoused at the Waiʻanae waterfront. The POW Farm Village seeks to provide stable shelter and refuge for this community. It has been home to keiki (children), kūpuna (elders), and working families, and has served as a refuge to recover from financial disaster, trauma, abuse, addiction, injury, and illness. The leaders of POW seek to develop the Farm Village as a blend of modern and traditional Hawaiian communal living in a safe, sustainable, and economically viable setting.

24. The residents of POW Farm Village face daunting challenges posed by wildfire, flooding, drought, and other climate-related challenges, along with resulting threats to their safety and cultural traditions. These factors inhibit their ability to survive and thrive economically as a community of previously unhoused individuals.

25. In July 2024, Plaintiff submitted to EPA its grant proposal titled "Uplifting the Waiʻanae Community for Resilience and Vibrance" ("Uplifting Waiʻanae"). The proposal identified strategies and project tasks designed to counter climate-related threats to the Waiʻanae community through a range of resilience initiatives, including innovative containerized

agricultural technologies, micro-grid systems, pollution mitigation, stormwater abatement, native and food plant reforestation, wildfire mitigation, and workforce development.

26. On or about December 12, 2024, Plaintiff received a Notice of Award and Grant Agreement from EPA. The Grant Agreement awarded grant funding in the amount of $13,939,738 to support the project work identified in Plaintiff's proposal. EPA subsequently transferred these funds to an Automated Standard Application Payments ("ASAP") account for distribution to Plaintiff beginning in January 2025.

27. The Grant Agreement is a public purpose agreement within the meaning of 31 U.S.C. § 6304. The competitive process by which the CCG program awards were made demonstrates that the award met the goals of the program and fulfilled the statutory mandate.

28. Shortly after receiving notice of its award, Plaintiff commenced work under the Grant Agreement and began drawing down grant funds, beginning with $9,279.89 on February 19, 2025.

29. On February 20, 2025, EPA Assistant Deputy Administrator Travis Voyles identified a set of "approved to cancel" grants awarded under the ECJP. On February 25, 2025, Mr. Voyles reviewed existing grant programs administered by EPA for consistency with Agency policy priorities. That day, Mr. Voyles decided that the ECJP should be terminated for policy reasons.

30. In furtherance of the termination decision, in March 2025, EPA abruptly and without prior notice or explanation suspended Plaintiff's ASAP account, depriving Plaintiff of access to funds and effectively seizing the funds. The account was briefly opened on May 1, 2025 for a single day, allowing Plaintiff to draw down a second payment of $24,201.61, and then it was immediately suspended again.

31. On May 1, 2025, EPA abruptly and without prior notice advised Plaintiff that its grant was terminated and ordered Plaintiff to cease work on the Uplifting Waiʻanae project. At the time of termination, Plaintiff had incurred costs in excess of $165,000 under the terms of the Grant Agreement.

32. On March 17, 2026, Plaintiff's ASAP account was again briefly reopened for Plaintiff's final drawdown of $131,980.99. As of the filing of this complaint, Plaintiff has only received a total of $165,462.49 out of the $13,939,738 authorized and owed to Plaintiff under the Grant Agreement.

**III. EPA's Unlawful Termination of the Grant.**

33. EPA has not contested that it terminated the entire ECJ Program. *Sustainability Inst.*, 2026 WL 1694522, at *1. The declarations and admissions filed in *Sustainability Institute* are binding on the Defendant here.

34. EPA cancelled the entirety of the ECJP unlawfully. *See id.* at *5. The District Court for the District of South Carolina reasoned that the "premature shuttering of the ECJ Program and refusal to administer it" were contrary to the express intent of Congress and arbitrary and capricious. *Id*. The District Court declined, however, to issue a permanent injunction, and directed the affected parties to this Court to seek damages. *Id*.

35. The determination by the District Court in *Sustainability Institute* that EPA's termination of the ECJ Program in contravention of § 7438 was unlawful, *id.* at *5, establishes that termination of the Grant Agreement was unlawful.

36. Even without the determination that EPA's termination of the ECJ Program was unlawful, Defendant breached the Grant Agreement. The applicable terms and conditions of the Grant Agreement provided for unilateral termination by EPA only under limited circumstances, none of which existed at the time of termination on May 1, 2025.

37. The General Terms and Conditions referenced by and incorporated into the Grant Agreement authorized EPA to unilaterally terminate the grant only in the event of the grantee's failure to comply with the terms and conditions of the grant or pursuant to the programmatic terms and conditions specified in the grant.

38. The programmatic terms and conditions referenced by and incorporated into the Grant Agreement provide for termination by EPA only as a result of the grantee's substantial noncompliance with the grant's terms and conditions, or where evidence of the grantee's fraud, waste, or abuse supports termination for noncompliance under 2 C.F.R. § 200.339. There were no other provisions for termination, and any unilateral termination provisions must be clearly and unambiguously incorporated into the Agreement.

39. At all relevant times, Plaintiff fully performed each of the duties and obligations it was required to perform under the Grant Agreement.

40. In a May 1, 2025, memorandum to Plaintiff ("Termination Memorandum"), EPA notified Plaintiff that it was unilaterally terminating the Grant Agreement "effective immediately." The Termination Memorandum stated the Agreement was being terminated "on the grounds that the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals" and because "[t]he objectives of the award are no longer consistent with EPA funding priorities." No other reasons for termination were provided in the Termination Memorandum.

41. Also on May 1, 2025, EPA transmitted to Plaintiff an amendment to the Grant Agreement notifying Plaintiff of its unilateral termination of the grant ("Termination Amendment"). The Termination Amendment did not specify the grounds for termination but stated generally that "[t]he Agency is asserting its right under 2 CFR 200.340 and the Termination

General Terms and Condition of this agreement to unilaterally terminate this award."

42. The Grant Agreement's terms and conditions did not authorize EPA to terminate Plaintiff's grant on the grounds that the grant award no longer effectuates program goals or agency priorities. The Grant Agreement's terms and conditions did not incorporate 2 C.F.R. § 200.340. *See also id*. § 200.340(b) ("The Federal agency . . . must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.").

43. At no time did EPA notify Plaintiff that it had failed to comply with any of the terms or conditions governing the Grant Agreement, or that it had engaged in waste, fraud, or abuse in connection with the grant. Nor did EPA at any time cite any such conduct as a purported reason for its termination decision. Defendant's stated reasons for termination were unrelated to any purported noncompliance, fraud, waste, or abuse by Plaintiff.

44. Even if EPA had been permitted to terminate the Grant Agreement on the ground of a change in agency funding priorities, which it was not, there was no such change. EPA did not identify existing priorities, did not identify a change in priorities, and did not analyze how each specific award no longer effectuated agency priorities. As stated by the District Court in *Sustainability Institute*, "contrary to Congress' will, EPA issued guidance that shuttered the ECJ Program before its end date, of September 30, 2026. *See* 42 U.S.C. § 7438(a)(1)." *Sustainability Inst.*, 2026 WL 1694522, at *4. In fact, the Grant Agreement was entirely consistent with Congress's statutory mandate and EPA's stated priorities of prioritizing merit and eliminating waste, fraud, and abuse (neither of which was a change in agency funding priorities), and EPA made no findings to the contrary.

45. EPA breached the Grant Agreement by unilaterally terminating it in violation of the terms and conditions specifying the sole bases for its termination.

46. At all relevant times, Plaintiff was fully ready, willing, and able to perform each of its obligations under the Grant Agreement. Plaintiff fully complied with the terms of the NOFO and the Grant Agreement and was fulfilling the public purpose of the Grant Agreement.

47. By suspending Plaintiff's ASAP account, EPA effectively seized Plaintiff's grant money without notice or explanation for the amount of money taken, and without regard for any pending costs Plaintiff had already committed to incurring in reliance on the funds' availability.

**IV. Harms to Plaintiff**

48. Plaintiff has suffered compensable harm as a result of Defendant's unlawful termination of the Grant Agreement and is entitled to recover any and all expectation, reliance, restitutionary, and other damages, including but not limited to the damages described in the following paragraphs.

49. Damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344–45 (Fed. Cir. 2003); *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997). Damages are calculated by "perform[ing] the necessary comparison between the breach and non-breach worlds." *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008).

50. It was reasonably foreseeable to the Defendant at the time of entering the Grant Agreement that unlawful termination would render it liable for the remainder of the full award amount. EPA created the grant in order to carry out the public purpose for which Plaintiff successfully competed for funding, and Defendant agreed to support. Only the full amount of the award would place Plaintiff in the same position it would have been absent the breach. Compensating Plaintiff for pre-termination costs provides, at most, only those payments that Defendant must make to Plaintiff under 2 C.F.R. § 200.343 and 2 C.F.R. § 200.472 without regard

to its breach of the Grant Agreement. The public purpose contemplated by the parties to the Grant Agreement, as well as Congress's intent in passing the IRA, remains unfulfilled.

51. Plaintiff has been deprived of the vast majority of the $13,939,738 awarded to it in the Grant Agreement, including all grant funds not previously released or remitted to Plaintiff through its ASAP account or otherwise. Absent Defendant's breach, Plaintiff would have had full access to and use of these funds in completing the project work described in the Grant Agreement and thereby accomplishing the grant's statutorily authorized public purpose. At a minimum, Plaintiff is entitled to recover as damages the total amount of the grant award, less funds previously distributed, in order to place Plaintiff in the position it would have occupied absent Defendant's unlawful termination.

52. Defendant's unlawful actions have also damaged Plaintiff by impairing its mission and depriving it of the means of assisting Wai'anae community residents in meeting the environmental and economic challenges they face and otherwise advancing the well-being of the community through the Uplifting Wai'anae project.

53. Plaintiff has suffered additional compensable harm due to the sudden and unanticipated disruption to its operations and the resulting need to redeploy its personnel and resources, both in the short term and for the duration of the three-year project period, as well as other specific and compensable consequences of the terminated grant.

54. As a result of Defendant's unlawful actions, Plaintiff was unable to develop and implement programs, including microgrids and containerized farms, that would have served as exemplars for other communities located throughout Hawai'i and Asia Pacific. For example, at least three entities expressed interest in using the Uplifting Wai'anae project as a model for other communities, including the Office of Hawaiian Affairs, the Department of Hawaiian Home Lands,

and the Hawaii Community Foundation. Staff from the then-U.S. Department of Defense had also expressed interest in the Uplifting Wai‘anae project in promoting regional stability in the Indo-Pacific Command area of responsibility. Plaintiff has not yet successfully obtained grants from any of these prospective partners. Plaintiff has suffered compensable harm resulting from being denied the opportunity to refine and leverage these programs in order to assist other communities that seek to mitigate climate-related harms through innovative and sustainable strategies.

### V. Plaintiff Timely Submitted Its Administrative Dispute to the EPA; No Further Exhaustion is Required.

55. The May 1, 2025 Termination Amendment notified Plaintiff that if it disagreed with its terms and conditions, Plaintiff was required to furnish a notice of disagreement to EPA within 21 days after its mailing date.

56. By letter dated May 15, 2025, Plaintiff submitted to EPA its timely notice of disagreement with the Termination Amendment. Plaintiff's notice included a request that the Grant Agreement be reinstated.

57. Citing 2 C.F.R. § 1500.15, the May 1, 2025 Termination Memorandum instructed Plaintiff that if it wished to dispute the termination decision, it must submit its dispute to EPA no later than 30 calendar days from the date of the Termination Memorandum.

58. On May 23, 2025, Plaintiff timely submitted its letter disputing the termination to EPA pursuant to Part 1500. Plaintiff reiterated that disagreement by another letter dated June 13, 2025.

59. On August 29, 2025, EPA notified Plaintiff by email that its request for reinstatement was "dismissed," and the administrative dispute concerning the termination was "moot" because Congress had rescinded unobligated funds by new legislation. This assertion was incorrect because the funds obligated under the Grant Agreement were not unobligated. Plaintiff

disputed the August 2025 determination by letter dated September 11, 2025.

60. Following additional communications with EPA, Plaintiff submitted its request for pre-termination costs incurred prior to May 1, 2025, reserving its rights. EPA has reimbursed those costs, but PICHTR has incurred other unreimbursed costs. Reimbursement of those outstanding costs is insufficient to make Plaintiff whole following EPA's unjustified termination of the Grant Agreement.

61. Although Plaintiff chose to administratively dispute the termination by EPA, neither its Grant Agreement nor applicable statutes or regulations require Plaintiff to exhaust administrative remedies or otherwise obtain an administrative decision before pursuing an action in this Court. Further, requiring Plaintiff to continue pursuing an administrative claim before litigating its Tucker Act claim would be futile, inadequate, and result in irreparable injury.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of the Grant Agreement

62. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

63. To recover for breach of contract, Plaintiff must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

64. The Grant Agreement is a binding contract between Plaintiff and EPA that contemplates money damages.

65. The Grant Agreement was entered into by EPA officials with authority to bind the United States.

66. EPA breached the express terms of the Grant Agreement by wrongfully terminating it and denying Plaintiff access to the funds it was owed. EPA identified no valid grounds for termination.

67. EPA's breach of the Grant Agreement has caused Plaintiff to suffer substantial monetary damages in an amount to be determined at trial, including but not limited to the damages described in Paragraphs 48-54 above.

**COUNT II**
**Breach of the Duty of Good Faith and Fair Dealing**

68. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

69. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (other citation omitted).

70. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting Ce*ntex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

71. The Grant Agreement is a binding contract that contemplates money damages.

72. The Grant Agreement was entered into by EPA officials with authority to bind the United States.

73. The Grant Agreement contained a provision by which EPA agreed to make a specified amount of federal funds available to the Plaintiff for its Uplifting Wai'anae project.

74. Plaintiff entered into the Grant Agreement with EPA with the reasonable

expectation that EPA would comply with the terms of that Agreement and that EPA would act in good faith and deal fairly with Plaintiff.

75. EPA breached the Grant Agreement's implied duty of good faith and fair dealing by, among other things: targeting the Grant Agreement for unilateral termination in violation of the Agreement's terms and conditions, directing Plaintiff to stop work under the Agreement, denying Plaintiff access to funds already awarded to Plaintiff without prior notice or explanation, preventing Plaintiff from spending money already awarded to it, unilaterally imposing new terms and conditions on Plaintiff, and insisting that the funds already awarded to Plaintiff were unobligated despite factual and legal support to the contrary.

76. EPA's actions interfered with Plaintiff's performance under the Grant Agreement and destroyed Plaintiff's reasonable expectations regarding the fruits of its Grant Agreement.

77. Upon information and belief, EPA's actions were intended to interfere with Plaintiff's ability to execute the Uplifting Waiʻanae project plans set forth in its grant proposal and the Grant Agreement, despite lacking any legal authority to do so.

78. EPA's actions caused Plaintiff to suffer substantial monetary damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment against the United States as follows:

A. Awarding money damages to Plaintiff in an amount to be determined at trial;

B. Awarding any allowable pre- and post-judgment interest;

C. Awarding Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

D. Granting other such relief as this Court may deem proper.

Dated: June 26, 2026

Respectfully submitted,

*s/Amy E. Powell*
Amy E. Powell
LAWYERS FOR GOOD GOVERNMENT
1319 F St. NW, Suite 301
PMB 181
Washington, DC 20004
Phone: 646-246-4633
Phone: 404-913-5529
amy@lawyersforgoodgovernment.org

*Of counsel:*

*s/Kunyu Ching*
Kunyu Ching
LAWYERS FOR GOOD GOVERNMENT
1319 F St. NW, Suite 301
PMB 181
Washington, DC 20004
Phone: 404-913-5529
kunyu@lawyersforgoodgovernment.org